IN THE CIRCUIT COURT OF JACKSON COUNTY, WEST VIRGINIA

TERESA EVANS,

        Plaintiff,

v.

LEAR CAPITAL, INC., a corporation and
Its Affiliates; SELF DIRECTED IRA
SERVICES, INC.

        Defendants.

Civil Action No. 17-C-31
Honorable Judge Lora Dyer

## FIRST AMENDED COMPLAINT

Now comes plaintiff and complains and says as follows:

1.     Plaintiff, Teresa Evans, is a resident of Ripley, Jackson County, West Virginia.

2.     Lear Capital, Inc., (hereinafter "Lear,") is a California corporation, authorized in the State of West Virginia, which is, among other activities, in the business of advertising in West Virginia for residents of the State of West Virginia to purchase investments from Lear and to obtain money from West Virginia residents purportedly to make money for West Virginia citizens by purchasing gold and silver and precious metals and by otherwise purposely directing business activities toward residents of this State and conducting business in this state.

3.     Self Directed IRA Services, Inc. is a Texas Corporation, which sets up and maintains IRA's for persons in West Virginia, for defendant, Lear, including setting up and maintaining an IRA account for the plaintiff and otherwise purposely directs business activities toward residents of this State and conducts business in this state.

4.     Plaintiff is informed and believes, that at all times mentioned in this complaint, defendants were acting on their own behalf and on behalf of each other as the agents, servants,

EXHIBIT

A

tabbies

partners, employees and on behalf of each other. The defendants, in doing the things alleged in this complaint, were acting within the course and scope of their agency, partnership and/or employment and within the scope of their authority and otherwise with the permission and consent of the other party.

5.      Plaintiff is informed and believes that at all times mentioned in this complaint defendants were participating in a joint venture with one another, or participating in a joint enterprise, one of the other, in the conduct complained of herein.

6.      Prior to October 2015, defendant Lear, by and through its agents, servants, employees and "affiliates," set about to and with the intent and purpose to obtain money from plaintiff under false pretense by misrepresentation of the value of investing in gold and silver, the fees associated therewith, and by other means as set out below.

7.      Prior to and during October 2015, defendant Lear, by its agents, servants and employees, including Dmitri Aaron Koonce ("Dmitri"), called plaintiff at her home, at her place of work, with the intent to induce her to part with her money and defendant made statements to plaintiff that the price of gold and silver was increasing and he stated that gold and silver were stable as an investment, historically, while other investments were not as stable.

8.      Plaintiff had never invested in gold or other metals, of any nature or kind, nor was she knowledgeable about the value of gold or silver as an investment, nor did she understand the business of gold or silver valuation, terminology, how it was purchased, sold or held and maintained, and she explained to Dmitri that she did not know or understand how to purchase, value, hold or sell gold in any manner whatsoever and, therefore, she advised Dmitri that he and defendant Lear would have to explain to her all matters pertaining to investing in gold and silver.

9.      Plaintiff, therefore, was not a knowledgeable or experienced trader and Dmitri, prior to October 2015, promised to explain to her all information which she needed to know concerning the purchase, valuation, sale and investments concerning gold and silver and as to the relationship, terms and conditions between her and Dmitri and defendant Lear, and plaintiff believed defendant and Dmitri and she relied upon him to advise her of same.

10.     Defendant Lear, by its agents, servants and employees, by their words and actions, gained plaintiff's trust and she relied upon defendant to be honest and truthful and she also relied upon to explain the terms utilized by him and defendant so that someone like her, without any knowledge of same, would understand the business and terminologies utilized by defendant in discussing the purchase of gold or silver.

11.     On October 26, 2015, Dmitri sent to plaintiff an e-mail wherein he explained the fee that plaintiff would be charged if plaintiff invested in gold and silver through defendant Lear's firm as follows:

> "Great chatting with you today. Based on our conversation and understanding. Rolling over a portion of your IRA above $50,000 would put you at the institutional level that would give you the best pricing at the minimum/maximum of 2% as agreed. I'll call you in a couple of days to make sure you received the information we spoke about. Have a great day. Kind regards,"

12.     On October 27, 2015, Dmitri e-mailed the following message concerning the fees plaintiff would be charged for purchasing gold and silver by her:

> "Hi Teresa, The 1st year fee is $275 that will subtracted from the monies that are transferred for the 1st year. The subsequent years will be $175 which is a lil over $14 per month to hold and maintain your metals at Brinks depository in Salt Lake City, Utah. We have 2 IRA promotions to cover your up-front fees for years. The 1st one is us sending you a $500 check for any transfers over $50,000 or the other promo is for $50,000 you get $1000 of free silver or gold depending on the asset you can choose. For every $25,000 in addition to that you get $250 in free silver or gold, that's it. If you have any more questions Teresa feel free to ask. Have a great day. Kind regards,"

13.     On November 2, 2015, Dmitri wrote:

"Hi Teresa, Hope you had a relaxing weekend. Just checking to see if you had any more questions about the IRA process. If not, after you fill out the apps. Just drop them off at a FEDEX location or box. Or if it's easier give me a call. I'll send FEDEX to your home or office and just hand him over the prepaid FEDEX envelope and we'll get the ball rolling. We're receiving daily articles about a dollar collapse as well as a stock collapse. Good time to diversify before we see a surge in metals and a crash in stocks. We'll chat soon.   Kind regards,"

14.     Defendant Lear, by it agents, servants and employees, through television and radio advertisements in West Virginia, caused plaintiff to worry about having her money in stocks and also the collapse of the dollar as Dmitri also explained to her in the November 2, 2015, e-mail above.

15.     Defendant Lear also caused plaintiff to believe that there would be a surge in metals, including gold and silver, in the near future and that by sending plaintiff's IRA account money to the defendant Lear, they could protect her from the impending losses in value of her life-long savings by investing in gold and silver.

16.     On December 10, 2015, at 5:01 p.m., defendant Lear, by and through Mr. Salvador, wrote to plaintiff and stated:

"Hello Teresa, I have made multiple attempts to contact you but no luck as of yet, a lot has happened from the last time we talked and I would like to share new developments that we see out in the markets. Please send me a note when is a good time to talk?"

17.     At all times, Dmitri and Mr. Salvador were acting as the agents, servants and employees and as partners and joint venturers of Lear.

18.     Defendant Lear, by its agents, servants and employees, pursued her and continued to make her believe that she was going to lose money in stocks or otherwise by the devaluation of the dollar.

19.     Throughout the time period leading up to October 2015, and thereafter, by various means and methods, including multiple calls to her home and to her person at work and other places in West Virginia, and by sending e-mails to her and by advertisements, defendant Lear by misrepresentation and trickery, made and caused plaintiff to believe defendant Lear's misrepresentation by both acts and overt statements which were in all respects, not true and defendant Lear knew that they were intentionally seeking her out for the purpose of obtaining, converting and taking her money under false and fraudulent pretenses.

20.     As Lear continued to pursue her, on December 10, 2015, plaintiff advised Mr. Salvador that her father had a stroke and then had additional strokes and that her only sister's husband had a lung transplant only to discover that he had been discovered to have lung, liver and spine cancer and that her sister-in-law was diagnosed with cancer.   Consequently, she advised Salvador that she had been under extreme emotional distress and that she had taken her sister-in-law into her home and was assisting her at her home with dealing with the trauma of chemotherapy.  She told him that she and her family had been overrun with the situation.

21.     Defendant Lear, by Mr. Salvador, on the same day, December 10, 2015, stated that he was sorry for her problems as stated above, but he reminded her that:

a.     "We have seen a lot happen lately and things are still moving regardless if you have time or not;" and

b.     "We have a turn-key system where we do all the heavy lifting for you when it comes to establishing your account."

c.     "Let's please find a time that we can talk."

d.     "I promise you one thing, it won't be a waste of your time."

e.     "There is a lot at risk on your end the retirement account that can be effected very negatively overnight, IF WE DON'T DO ANYTHING ABOUT IT."

f.     "Silver has always been a great way to preserve wealth."

g.      "When is good time/day that we can touch base?"

h.      "Let us help you."

22.     The above statements caused the plaintiff to believe that she must do something or lose all or a significant part of the money that she had worked for over her lifetime and saved in her IRA account for retirement for herself and her family.

23.     On December 10, 2015, at 6:16 p.m. defendant Lear, by Salvador, wrote to plaintiff and stated:

a.      "I have attached two new articles that were just published."

b.      "Take the time to read this."

c.      "Facts are facts."

d.      "Let's not be blindsided like many Americans were back in 2008 market crash."

24.     On January 20, 2016, at 6:16 p.m. Salvador, for defendant Lear, wrote to her and stated that Lear Capital was "the nation's most highly endorsed gold company." And that "we are committed to help you protect and grow your savings and retirement account."

25.     On January 20, 2016, defendant Lear forwarded to her additional articles, brochure and videos promoting gold and silver as the only safe manner in which to protect her retirement.

26.     On January 26, 2016, at 1:49 p.m. Salvador again wrote and stated that:

a.      "The silver markets continue to move up."

b.      "I wanted to find a time we can re-visit the possibility of protecting a portion of your portfolio."

27.     On January 26, 2016, at 11:31 p.m., Mrs. Evans wrote back and told Salvador that she "was pulling into chemo doctor," "just not a good time right now."

28.    On January 26, 2016, at 2:36 p.m., Salvador, disregarding that it was not a good time, wrote back to plaintiff and stated "what time would work best today."

29.    On February 2, 2016, Salvador, for defendant Lear, stated to plaintiff:

"Hello Teresa, Hope you're doing well. The markets are down again today another triple digits. I made an attempt to reach you earlier, let me know if you have time today."

And he advised her to read an article touting the wisdom of investing in gold and silver.

30.    On or about March 21, 2016, defendant Lear advised plaintiff that they had a "dedicated IRA Department" that could hold her money and continued to promise her that they could protect her retirement and that failure to purchase gold or silver would lead to disaster."

31.    On or about March 2016, plaintiff, in reliance upon the misrepresentation and continuing contacts with plaintiff and the misrepresentation of defendant, by acts and omissions, caused plaintiff to believe that she must invest in gold or silver or lose a significant portion of her money, contacted defendant Lear and advised Lear that she would invest as they had told her.

32.    Defendant Lear advised plaintiff that she had to set up a "SEP" account, which was done with the Horizon Bank in Houston, Texas and "Self Directed IRA Services, Inc.," a subsidiary of Horizon Bank, (hereinafter "SDIRA.") At the time, plaintiff did not know there was a separate entity.

33.    On or about March 23, 2016, plaintiff relied upon the representations that were made to her by defendant Lear and signed a form at the request of Greg Shenon, an agent, servant, employee, affiliate, partner or joint venture of defendant Lear with the position and title of "IRA Administrator."   The form was for "employer and employee" IRA accounts, and plaintiff advised Lear that the form did not appear to be applicable to her.   The form was a form for defendant Self Directed IRA Services, Inc. and had its name on the form as being its own

form prepared by it. Therefore, defendants were acting for and on behalf of each other in establishing an IRA account in Texas for a purpose as represented by Lear to protect her retirement money.

34.    On or about March 30, 2016, Lear contacted Scottrade which held plaintiff's IRA account and advised them that they were to wire $300,000 from plaintiff's IRA account to SDIRA.

35.    On March 31, 2016, Salvador wrote to plaintiff and stated at different times that day:

a.    "I made an attempt to reach out to you this morning when would be a good time."

b.    "Timing is sensitive because of price movement. This will only take at the most a few minutes of your time."

36.    On or about March 30, 2016, Lear called Teresa Evans and advised her of the storage fees which were $275 for first year for holding the gold and silver. At this time, the only fees Teresa had been told she was to pay was the storage fee and a 2% commission and fee as set forth in paragraph 11 above.

37.    On or before March 23, 2016, and prior to her permission to wire the monies, Teresa Evans, relying upon the representations of Lear and its agents, servants and employees was led to believe and believed that Lear was offering her a proposition and agreement that for the fees she had been advised of as set forth above or for fees which would certainly not exceed that amount, Lear would purchase gold and/or silver for and on her behalf and assure that her IRA and monies and gold and silver, which was to be purchased, would be protected and safe and that defendant's assurances and statements assured her that she would make money from Lear's purchases and management of her money.

38.     After coming to an understanding of the terms and conditions of the agreement between plaintiff and Lear and after Lear advising her to transfer her money into an IRA account, the same set up in Waco, Texas, plaintiff agreed only with the terms and conditions that were discussed above. She then consented that Scottrade was permitted to wire $300,000 from her account to SDIRA.

39.     After she wired the money to what was represented to her as being an individual IRA account for her, she believed the money remained hers and under her possession and control like the one she had in Scottrade and she trusted SDIRA to protect and hold her money for safe keeping and would not transfer any of her money without her specific direction.

40.     After Lear and Scottrade transferred or caused to be transferred the $300,000 to SDIRA, then SDIRA transferred the $300,000 to Lear without specific direction from plaintiff. SDIRA then failed and refused to provide plaintiff with any documents or accounting for the transfer from March 30, 2016, until October 10, 2016.

41.     On April 11, 2016, Lear, by Salvador, advised plaintiff that "your metals have been shipped out as of today, the latest update on silver as of today is that silver is now up 18% from beginning of the year.  Your timing could not have been better.  You are right on track to see the same advantages most investors saw when they invested during the last market correction and we all witnessed silver going up 600%.  I will be tracking your investment along with Dmitri Koonce. We both will be on top of the markets and advising you how and when to sell in the coming years."

42.     Plaintiff relied upon the above advice and believed that her $300,000 was increasing in value at a reasonable, if not good, rate based upon Lear defendant's employees or

agents. She was at that point comforted and felt that they had and were protecting her money and would do so in the future.

43.     On April 21, 2016, plaintiff received a letter from Lear advising her that "Our account executives have consistently ranked in the upper 98[th] percentile of customer service surveys, but our goal in 2016 is to further our best in class service mark."

44.     On April 28, 2016, Teresa Evens received a letter that stated "With the volatility of today's economy, Precious Metals are a great investment area to compliment your overall portfolio. Gold and Silver are great hedges against inflation and can protect your investment portfolio in this uncertain market" and Lear asked plaintiff to refer friends, family and co-workers and they would reward her. At this point, plaintiff was never told what her account value was in any other way. She believed her investment was solid and she was making money on the amount she was told was invested on her behalf, and the articles Lear sent further encouraged plaintiff. They stated the "gains are just getting started" and similar language.

45.     After having not received an accounting statement from Lear or SDIRA by August and having been accustomed to Scottrade's prompt and regular reporting of her IRA, plaintiff requested Greg Shenon, a Lear employee, to provide her an accounting of her account and its value. However, Mr. Shenon and Lear failed and refused to provide her with an accounting and on October 9, 2016, plaintiff again asked for an accounting of her IRA account activity.

46.     On October 10, 2016, plaintiff received an e-mail with instructions as to how she could log onto her account and found that it had dropped in value by approximately $100,000 and was only valued at about $200,000 without explanation as to why she had lost $100,000,

one-third of the amount she invested in a seven month period.  On October 29, 2016, at 1:13 p.m., she wrote to Salvador:

> "Can you take a look at my account?  I'm having trouble understanding how gold and silver are rising and my account is down $100,000.  Am I reading something wrong?"

47.      On October 31, 2016, at 11:39 a.m., 2 days later, Salvador, for Lear, wrote back:

> "Good Moring Teresa, I hope all is well and to answer your question. Yes you are reading it wrong. When can we get together and talk over the phone ? I tried contacting you several times during the month but no luck."

48.      On October 31, 2016 at 10:16 a.m., plaintiff, overjoyed that she had not lost $100,000 wrote "Oh yay!  Could we talk at 3:30 p.m. eastern time?  Salvador suggested the next day.  Plaintiff agreed but requested once again that Lear provide her with "my documents and current value of account."

49.      On or about October 4, 2016, plaintiff finally had a conversation with Salvador. In that conversation, plaintiff told Salvador that she finally logged into her account and found that her account was down $110,000 and that she wanted to know why that was so when silver and gold had risen in value since she had bought them.  Lear had advised her, after she had purchased the gold and silver, that her value was increasing based upon the e-mails and articles that Lear had sent to her.  Salvador replied as follows:

a.      When a client receives their account statement it does not reflect the real value of her account because the value in her statement was wrong.

b.      Then, he stated to the effect that "when you purchase a home the fees are up front."  When you sell your home you take all of the profit.  We take our fees up front and when she sold would she would receive all the profit because Lear doesn't take anything on the back end.

c.      Salvador stated that he had gone over everything with her when they had obtained the money from her in the first place.

d.      Salvador admitted that when he went over the shipping order with her "it was quick, quick, quick, quick…" and they did everything quickly and that he,

Salvador, was fearful that when Lear had done as quickly as they had done it with plaintiff, that she was going to be confused about what happened to her money.

e.    Salvador stated that everything was done quickly, but had falsely claimed that plaintiff filled out the document.

f.    He then stated that Lear's fee was 20-25% of the $300,000 which is $60,000 to $75,000.

g.    He then told her she would have to talk to their legal department when she stated that she wanted her money back and that the legal department would be in touch with her.

50.    During the conversation with Salvador, plaintiff requested that Lear send to her any document which explained the right Lear had to take $100,000 out of her account and any document even disclosing that they had taken $300,000 from her account.

51.    Salvador stated that language in a shipping and transaction document that he had admitted was done quickly had information concerning the right to a fee as they had deducted the same from her account.

52.    The agreement that plaintiff entered into with Lear was complete on or before the date that she signed the form to transfer the money to Lear and she forwarded the $300,000 to Lear on March 30, 2016. The fees disclosed to her were as stated by Lear in e-mails to her and by Lear's employees. No other fees were ever discussed. There was never a discussion or disclosure ever of any fee before or after that date of March 30, 2016 which indicated that the fee was to be 20%, 25% or 1/3 for Lear to convert to themselves upon receiving the money from her IRA account.

53.    What did occur on March 31, 2016, at 12:09 p.m., however, was that Dmitri Koonce called plaintiff on the phone and told her she needed to get to a computer to sign a shipping document so that her purchase of gold and silver could be taken care of by them.

Plaintiff was working at the time and her family issues as above were still a part of her everyday life.

54.     Dmitri then, at 12:13 p.m. sent her an e-mail signature documents in Docusign program format.

55.     Dmitri stayed on the phone with plaintiff and he told plaintiff that they have already filled everything out and all she needs to do is sign and initial certain places.  He then directed plaintiff to the signature block in Docusign format and told her where to sign the shipping document.  He did not tell her that she should read it, that there was anything in it between Lear and her other than the shipping of the gold and silver so that they could purchase the gold and silver.  Plaintiff complied and signed it as directed.

56.     The entire time period from the time plaintiff received the e-mail with document and returned it to Dmitri was 3 minutes from 12:13 to 12:16 on December 31, 2016.  During that time, Dmitri continued to tell her how good of an investment she was making and encouraging her to sign the Docusign signature blocks.

57.     Dmitri did not give plaintiff time to read the documents, defendants did not suggest to her that she should read it before signing and plaintiff did not read the document before signing it based on Salvador's statement that it was a shipping document which would enable Lear to ship the gold and silver to the IRA holding facility.

58.     Salvador then placed plaintiff on hold for several minutes as he explained the purchase was taking place.  Then Salvador came back on the line and told her he had to go over a few things and then everything will be over.

59.     Lear claimed that plaintiff had agreed to a fee in that conversation, however, the question and answer Lear refers to was intentionally wrongfully stated in a way to mislead a

reasonable prudent person who had no knowledge of the Precious Medals' industry and was depending upon Lear and its employees to help her understand what she was doing so she would not make a mistake.

60.     She advised Lear that she had not even purchased stock for years because she was afraid she would lose her money and Lear agreed to help her for that very reason.

61.     Lear claims that telling plaintiff that "you understand that our maximum ask-to-cost fee is 33 percent" was sufficient to advise her that they had a right to take one-third of her principal IRA account as soon as it was in the IRA account.  Plaintiff did not believe or understand that ask-to-cost fee had anything to do with her obligation to Lear.

62.     Lear's legal counsel, Jeremy Jason and customer service representatives in November 2016, claimed that they would not help her, that their agreement was iron-clad and can't be breached and can't be broken and that you signed it and said yes in the recorded conversation and you are bound to it and the 1/3 fee is what you owed.  That was the first time plaintiff had been told that by a representative of Lear.  Before, Mr. Salvador said it was 20-25% in the conversation with him after plaintiff first learned of the $100,000 deduction, and plaintiff was told 2% at the time of the agreement and prior to when she had Scottrade wire them the money.

COUNT I

Plaintiff re-alleges the above allegations the same as if set forth herein and further alleges as follows:

63.     That on March 31, 2016, at 12:09 p.m., Lear representative Dmitri Koonce called Plaintiff Teresa Evans to inquire whether at that time she had access to a computer to receive a shipping document by email that she would need to immediately electronically initial and sign

14

and transmit back by email in order to authorize the shipment of the gold and silver that was being purchased on her behalf by Lear pursuant to their prior agreement. Said prior agreement which, as previously alleged, included a term that Lear could charge a 2% fee on any investment exceeding $50,000.00 in value.

64.     That on March 31, 2016, at 12:13 p.m., the Plaintiff Teresa Evans received the electronic-signature document via email. Further, that Dmitri Koonce had remained on the telephone and upon him transmitting the email and the plaintiff receiving the email and opening the electronic document, he then directed her to the boxes that required her electronic initials and signature. While asking her several questions when doing so, at no time did Mr. Koonce inform the plaintiff that her initialing and signing the shipping document and answering his questions would be creating a new contract or agreement that would contain any terms altering or supplanting any material terms of her prior agreement with Lear, including the material term that Lear could only charge a 2% fee on any investment exceeding the value of $50,000.00.

65.     That the electronic-signature shipping document was emailed back to Mr. Koonce at 12:16 p.m. on March 31, 2016, with the entire time spent discussing the locations which required the Plaintiff's initials and signature and answering his questions, taking significantly less than 3 minutes.

66.     That to the extent that Defendant Lear contends that such shipping document constituted a new valid and enforceable contract between the parties which altered or supplanted the terms of the parties' prior contractual agreement, and which enabled Lear to charge a fee no greater than 2% on investments exceeding $50,000.00 and which requires the parties to submit any disputes to arbitration, it is incorrect and Lear is guilty of fraud in the execution or inception of such contract. That in such event, plaintiff Teresa Evans was deceived as to the nature of her

15

act involving the shipping document and did not know or understand what she was signing and did not intend to enter into any such contract at all. Accordingly, mutual assent to such a contract was lacking and such alleged contract is void.

      67.    That, alternatively, in the event it is determined that such shipping document constitutes a valid and enforceable contract, the plaintiff was fraudulently induced as to an arbitration provision and any fee which appears in the contract. More specifically, at no time during the above described conversation did Mr. Koonce inform or advise the plaintiff that said document contained any arbitration provision and/or otherwise inform the plaintiff that any dispute which arose under such document would be required to be submitted to arbitration, let alone the terms or conditions of any such arbitration. As previously alleged, Mr. Koonce directed the plaintiff where to place her electronic initials and signature and did not advise her to read the entire document or otherwise even provide her with sufficient time to do so within the above described time period. Further, that even when an individual bears no duty to disclose material terms of a document or transaction to another, when they do act so as to disclose some of the terms or conditions they assume a duty to disclose all material terms and conditions. Accordingly, Lear is guilty of fraudulent inducement in regard to the arbitration provision and other provisions of said alleged contract and such alleged contract and arbitration provision is invalid, void, or voidable.

      68.    Lear in this case set about to intentionally, knowingly and fraudulently establish a scheme and design which they determined would be an iron clad way to defraud citizens in West Virginia by advertising on the radio and on television about (a) gold, silver and precious metals and that West Virginia citizens should invest in same by using scare tactics to drive persons like plaintiff to contact them for information concerning investments in precious metals.

69.    Lear, once contacted, devised a scheme and design by utilizing their staff to trick citizens like plaintiff to decide to invest with Lear and to use SDIRA as their IRA account which is controlled by Lear for the sole purpose to take plaintiff's money by converting the plaintiff's money unto itself as its own without plaintiff's knowledge.

70.    Lear intentionally and knowingly made statements to plaintiff as set forth above that induced her to have her IRA manager wire $300,000 of her savings to defendants under the false pretense that she would pay a 2% fee and make money on her investment and without telling her that they were going to take $100,000 to themselves without advising her of same.

71.    Plaintiff relied upon Lear's representations and as a result, she has been damaged in the following ways:

a.    She has lost all or at least well over $100,000 at this time since she does not have any of her money back even though she has demanded the same be returned to her and defendants have refused;

b.    She has lost the use and enjoyment of her money;

c.    She has suffered severe emotional distress as a result of Lear's acts, conduct and omissions; and

d.    Other damages including attorney fees and costs and expenses pertaining to her account.

Wherefore plaintiff demands judgment against defendants and each of them, jointly and severally, for compensatory and punitive damages; a trial by jury, the costs and disbursements of the action and for such other and further relief as the Court deems proper.

## COUNT II

Plaintiff re-alleges the above allegations the same as if set forth herein and further alleges as follows:

72.     Defendants and each of them are telemarketers who conducted telemarketing solicitation and activities within the meaning of West Virginia Code § 46A-6F-112 and § 46A-6F-113.

73.     Defendants and their agents, servants and employees and joint venturers, failed to make the mandatory disclosures required of West Virginia Code § 46A-6F-401 in that defendants failed to make material terms of the transaction clear and conspicuous.

74.     In the conduct described herein in plaintiff's complaint, the defendants engaged in unfair and deceptive practices in violations of § 46A-6F-501 by failing to obtain proper informed authorization and consent and engaging in conduct as set forth herein that created a likelihood of confusion and misunderstanding to a reasonable consumer and by providing substantial assistance or support to a telemarketer when each defendant knew or should have known that the telemarketer was engaged in acts that constituted violations of § 46A-6F-101 et seq.

75.     As a result of the wrongful conduct as aforesaid, plaintiff seeks and is entitled to compensatory damages, punitive damages, penalties, attorney fees, costs and interest and other remedies as prescribed by § 46A-6F-101 et seq., including but not limited to §46A-6F-502, or otherwise as provided by law.

76.     Defendants, by their agents, servants, employees, affiliates and joint venturers and/or partners, acting as alleged above, published, for the purposes set out herein, the following statements and committed the following acts and omissions which violated 46A-6F-101 et seq. by failing to promptly disclose, in a clear and conspicuous manner, material information while making its telemarketing communications to the plaintiff including, but not limited to:

a. failing to promptly disclose, in a clear and conspicuous manner, material information while making its telemarketing communications to the plaintiff regarding the fees charged; that

the purpose of the calls were to sell consumer goods rather than to give investment advice; the total cost to purchase and receive the consumer goods or services due to the failure to disclose in a clear and conspicuous manner the fees charged; all material restrictions, limitations and conditions to purchase and receive the consumer goods and services including the fees charged; all material aspects of the performance, quality, and nature of the consumer goods and services, including the risks of the investment, and the fees charged; all material aspects of the nature or terms of the refund, cancellation, exchange or repurchase policies; all material aspects of any investment opportunity offered, including, but not limited to, a description of the risk, liquidity, earnings potential, profitability, benefits, the value price, and location of the personal property the plaintiff would acquire.

b. By obtaining and submitting a payment of a substantial portion of plaintiff's IRA account to defendant Lear for an unauthorized fee without the plaintiff's express, verifiable authorization.

c. By engaging in unfair and deceptive conduct as explained in this complaint, which created a likelihood of confusion and misunderstanding to the plaintiff and any reasonable consumer.

d. By defendant Self Directed IRA providing substantial assistance and support to defendant Lear Capital, when Self Directed IRA knew, or consciously avoided knowing that defendant Lear Capital was engaging in acts and practices in violation of W.Va. Code § 46A-6F-501.

e. As a proximate result of defendants' conduct as aforesaid, plaintiff has sustained a loss of her retirement money, and was further damaged by being subjected to emotional distress, worry and in other ways as the record will reflect and as set forth herein.

Wherefore plaintiff demands judgment against defendants and each of them, jointly and severally, for compensatory and punitive damages; a trial by jury; recovery of costs and disbursements of the action and for such other and further relief as the Court deems proper.

COUNT III

Plaintiff re-alleges the above allegations the same as if set forth herein and further alleges as follows:

77.     The plaintiff sent a 20 day notice to cure pursuant to West Virginia Code § 46A-6-106.

78.     The defendant, Lear Capital, Inc., failed to cure the violations of the West Virginia Consumer Credit and Protection Act and failed to make an offer of cure and have failed to cure.

79.     Through the above described false advertising, fraudulent and intentional acts and omissions, by concealment and deception and other knowing and intentional acts and conduct, Lear has engaged in repeated and numerous violations of West Virginia Code § 46A-6-104, by engaging in unfair and deceptive acts and practices in the conduct of a trade or commerce.

80.     Through the above described false advertising, omissions, concealment and deception, Defendant Lear has engaged in repeated and numerous violations of West Virginia Code § 46A-6-102 (7) (B) (C) (E) (G) (H) (I), (K), (L) (M) and (N), as set forth herein and below.

81.     In their advertisements and statements affecting the plaintiff, Lear deceived customers, including the plaintiff, by falsely advertising the nature and value of the investments, falsely advertising and marketing themselves as investment advisors, and falsely advertising and misrepresenting fees, all as described in this complaint and including all conduct mentioned in this complaint.

82.     Defendant Lear deceived customers, including the plaintiff, into purchasing their services and products by concealing the true nature of the transaction, the money that

20

was to be taken by defendants, and by providing misleading and false investment advice and by misrepresenting the value that would be received, which was not as advertised, in its online, television, radio, and print advertisements and in direct communications to the plaintiff.

83.    Defendant Lear deceived customers, including the plaintiff, by falsely advertising the ability to provide the benefits from the purchase of gold and silver in the manner done by defendant. Defendant Lear promised, advertised and otherwise represented large and immediate gains that were not accurate or truthful, especially given that the defendants had taken about 33% of the plaintiff's investment money for themselves, without the plaintiff's knowledge or permission.

84.    Defendant Lear engaged in unfair and deceptive acts and practices by causing a likelihood of confusion or misunderstanding as to the goods and services it provided, including the amount of money it took for itself, and including the giving of investment advice when it was neither qualified nor actually giving real investment advice and by giving false investment advice.

85.    Defendant Lear engaged in unfair and deceptive acts and practices by representing that its goods and services had characteristics and benefits that they did not have, and by representing that its services had a status as investment advisors, that it did not have.

86.    Defendant Lear engaged in unfair and deceptive acts and practices by disparaging the goods, services or business of another by false or misleading representation of fact, including that the plaintiff's other retirement investments (through Scott Trade) were in immediate danger of a crash, collapse, or disaster.

87.    Defendant Lear engaged in unfair and deceptive acts and practices by advertising goods and services with intent not to sell them as advertised, including with respect

21

to monies deducted from investments by defendants.

88.     Defendant Lear engaged in unfair and deceptive acts and practices by making false and misleading statements of fact concerning the reasons for, existence of and amounts of reductions in the price paid for the gold and silver when plaintiff inquired about the value of her investment.

89.     Defendant Lear engaged in unfair and deceptive acts and practices by engaging in conduct which similarly created a likelihood of confusion and misunderstanding, including the manner in which it had the plaintiff execute documents, preconceived plans, schemes and designs to trick plaintiff and others similarly situated into believing that the only safe investment was silver, gold and metals and all other conduct alleged herein.

90.     Defendant Lear engaged in unfair and deceptive acts and practices by using deception, fraud, and false pretense, false promises and false representations as aforesaid, and by concealing, suppressing or omitting of material facts with respect to the value of the goods and services defendants provided, the risk associated with the same, the fees it charged, and the nature of its services as investment advisors.

91.     Defendant Lear engaged in unfair and deceptive acts and practices, in the conduct as aforesaid, by advertising, printing, displaying, publishing, distributing, and broadcasting statements and representations with regard to the sale of gold and silver including the rates, terms or conditions for the sale of the gold and silver, which were false, misleading and deceptive and omitted material information that was necessary to make the statements not false, misleading or deceptive.

92.     Defendant Lear stated in advertisements, upon which the plaintiff relied, including but not limited to the following:

    a.     "PROTECT YOUR ASSETS, MARKET GOING TO CRASH, GET YOUR

IRA INTO SOMETHING STABLE LIKE GOLD AND SILVER"

b.     "protect your IRA, dollar is going to crash and gut your retirement accounts."

c.     "Do you know why it's so important now for you to back a portion of your savings and retirement accounts with gold and silver?  There are 15 reasons. Here are three:  The bond bubble could burst any minute.  China wants to replace the U.S. dollar with its own currency.  And when the Fed raises interest rates, gold could soar to record highs again."

d.     "Learn how China could burst our bond bubble, crash our dollar and gut your savings and retirement accounts.  When you call, ask to get up to $500.00 in free gold or silver with a qualifying purchase.  The report is free, and China is making their moves now.  So don't wait.  Call 1-800-599-1989.  1-800-599-1989. Call now."

e.     ""The alarming truth." Hi, I'm Scott Carter, CEO of Lear Capital.  The media says the economy is doing fine.  Are they telling the whole truth?  Japan is printing money; Europe is printing, England is printing, the United States is printing. Everybody's doing it, printing money and manipulating financial markets, so it's not if this bubble will burst, it's when.  Call Lear Capital now and get your free video and insider report.  Find out what the experts know and what they're doing to get prepared. The stock market is rigged... Call Lear Capital to get the industry's best research free. When you call, ask to receive our special banks and billionaires' report."

f.     We're about to enter the greatest financial reset in history, so now is the time for people to invest in hard assets, to get their plan together and to really understand the context behind what's about to happen.  Call Lear Capital to get this free

report, the "Screaming fundamentals for owning gold." Find out how hard assets like gold and silver can help protect your hard earned dollars when the debt bomb bursts. It can't go on forever, and when it bursts, it's going to be the most destructive bubble in all human history."

g.     ""Time to invest." Would you like to own an investment that has the potential for a 30 to 40 percent increase, an investment that you can benefit from in a good economy or bad? That investment is silver. And for the first time in 11 years, silver is trading below the cost to mine it. If silver just returned to its mining cost, it would be a 35 percent increase in price. And if silver returns to its recent all—time high, it will have doubled in price again."

h.     "Would you like to own an asset that has the potential for a 60 percent increase or more? Well, that investment is silver, and you can buy it at today's low price. If silver just returns to half of its all-time high, it would be a 60 percent increase. And if silver returns to its recent all-time high, it will have tripled in price."

93.     As a proximate result of defendant Lear's acts, misconduct and violation of West Virginia Code, plaintiff was damaged by

a.     the defendants' unfair and deceptive acts and practices in that she paid, without her permission, an unreasonable and unconscionable fee;

b.     the defendants' unfair and deceptive acts and practices in that she has lost her retirement money; and

c.     the defendants' unfair and deceptive acts and practices in that she expected, as represented by defendants, large gains on her investment, but received only a tiny fraction of what was promised and advertised and, in fact, has lost the money taken by the defendants.

94.     As a proximate result, plaintiff was further damaged by being subjected to emotional distress, worry and in other was as the record will reflect and as set forth herein.

24

Wherefore plaintiff demands judgment against defendant, Lear Capital, Inc. for compensatory and punitive damages, statutory damages set forth in West Virginia Code§ 46A-6-106(a), plus attorneys' fees and costs, a trial by jury, and for costs and disbursements of the action and for such other and further relief as the Court deems proper.

COUNT IV

Plaintiff re-alleges the above allegations the same as if set forth herein and further alleges as follows:

95.     As a result of the conduct and facts as aforesaid, defendants have been unjustly enriched at the expense of the plaintiff.

96.     That said conduct, fact and circumstances were such that, in equity and good conscience, restitution should be made to the plaintiff.

Wherefore plaintiff demands judgment against defendants and each of them, jointly and severally, for compensatory and punitive damages; a trial by jury; recovery of costs and disbursements of the action and for such other and further relief as the Court deems proper.

COUNT V

Plaintiff re-alleges the above allegations the same as if set forth herein and further alleges as follows:

97.     Under the West Virginia Declaratory Judgments Act, this Court has the power to declare rights and status with respect to the parties as situated herein and with respect to contracts pursuant to W.Va. Code § 55-13-1 et seq.

98.     The Lear shipping document lists an arbitration clause.

99.     As described above, Dmitri, at 12:13 p.m. sent plaintiff an e-mail for signature of said shipping document in Docusign program format.

25

100.   Dmitri stayed on the phone with plaintiff and he told plaintiff that they have already filled everything out and all she needs to do is sign and initial certain places.  He then directed plaintiff to the signature block in Docusign format and told her where to sign the shipping document.  He did not tell her that she should read it, did not tell her that there was an arbitration clause in it, and did not tell her that there was anything in it between Lear and her other than the shipping of the gold and silver so that they could purchase the gold and silver. Plaintiff complied and signed it as directed.

101.   The entire time period from the time plaintiff received the e-mail with document and returned it to Dmitri was 3 minutes from 12:13 to 12:16 on December 31, 2016.  During that time, Dmitri continued to tell her how good of an investment she was making and kept encouraging her to sign the Docusign signature blocks.

102.   Dmitri did not give plaintiff time to read the document, he did not suggest to her that she should read it before signing and plaintiff did not read the document before signing it based on Salvador's statement that it was a shipping document which would enable Lear to ship the gold to the IRA holding place since it could not be sent to her since it was in an IRA.

103.   Salvador then placed plaintiff on hold for several minutes as he explained the purchase was taking place and then Salvador came back on the line and told her he had to go over a few things and then everything will be over.

104.   Defendants, in the manner they had the plaintiff Docusign the shipping document, did not obtain informed written consent from the plaintiff to the arbitration clause.

105.   The manner in which defendants attempted to impose their terms and conditions, including the arbitration clause, is insufficient to give rise to constructive notice that could bind the plaintiff.

106.    The agreement that plaintiff entered into with Lear was complete on or before the date that she signed the form to transfer the money to Lear and she forwarded the $300,000 to Lear on March 30, 2016.  The agreement was as stated by Lear in e-mails to her and by Lear's employees.

107.    The plaintiff's agreement with the defendants occurred outside of the shipping document and, therefore, the arbitration clause does not apply to plaintiff's claims.

108.    The arbitration clause in the shipping document, if enforced, attempts to remove all of plaintiff's Seventh Amendment state constitutional right to a jury trial without obtaining informed consent from her or providing her with reasonable consideration in exchange for giving up those rights.

Wherefore, plaintiff respectfully requests that the Court grant a declaratory judgment as follows:

a.    A declaration, with respect to any and all agreements between plaintiff and defendants, that the plaintiff did not agree to arbitrate any claims arising from any goods or services provided by defendants, and that the claims brought in this lawsuit are therefore not subject to arbitration.

Wherefore plaintiff demands judgment against defendants and each of them, jointly and severally, for compensatory and punitive damages; a trial by jury; recovery of costs and disbursements of the action and for such other and further relief as the Court deems proper.

TERESA EVANS,

By Counsel

Marvin W. Masters
West Virginia State Bar No. 2359
The Masters Law Firm lc
181 Summers Street
Charleston, West Virginia  25301-2177
(304) 342-3106
Counsel for Plaintiff
F:\5\1017\p002.docx

IN THE CIRCUIT COURT OF JACKSON COUNTY, WEST VIRGINIA

TERESA EVANS,

        Plaintiff,

v.

        Civil Action No. 17-C-31
        Honorable Dyer

LEAR CAPITAL, INC., a corporation and
Its Affiliates; SELF DIRECTED IRA
SERVICES, INC.

        Defendants.

## COMPLAINT

Now comes plaintiff and complains and says as follows:

1.    Plaintiff, Teresa Evans, is a resident of Ripley, Jackson County, West Virginia.

2.    Lear Capital, Inc., (hereinafter "Lear,") is a California corporation which is, among other activities, in the business of advertising in West Virginia for residents of the State of West Virginia to purchase investments from Lear and to obtain money from West Virginia residents purportedly to make money for West Virginia citizens by purchasing gold and silver and precious metals.

3.    Self Directed IRA Services, Inc. is a Texas Corporation.

4.    Prior to October 2015, defendant Lear, by and through its agents, servants and affiliates, set about to and with the intent and purpose to obtain money from plaintiff under false pretense by misrepresentation of the value of investing in gold and by other means as set out below.

5.    Prior to and during October 2015, defendant Lear, by its agents, servants and employees, including Dmitri Aaron Koonce, called plaintiff at her home and place of work and

with the intent to induce her to part with her money and made statements that the price of gold was increasing and stated that gold was stable as an investment historically while other investments were not as stable.

6.    Plaintiff had never invested in gold or other metals, of any nature or kind, nor was she knowledgeable about the value of gold as an investment, nor did she understand the business of gold valuation, terminology, how it was purchased, sold or held and maintained and she explained to Dmitri that she did not know or understand how to purchase, value, hold or sell gold in any manner whatsoever and, therefore, she advised Dmitri that defendant Lear would have to explain to her all matters pertaining to investing in gold and silver.

7.    Plaintiff, therefore, was not a knowledgeable or experienced trader and Dmitri, prior to October 2015, promised to explain to her all information which she needed to know concerning the purchase, valuation, sale and investment concerning gold and as to the relationship and terms and conditions as between her and Dmitri and defendant Lear, and plaintiff believed defendant and Dmitri and relied upon him to advise her of same.

8.    Defendant Lear, by its agents, servants and employees, by their words and actions, gained plaintiff's trust and she relied upon defendant to be honest, truthful and to explain the terms utilized so that someone without any knowledge of same would understand the business and terminologies utilized by defendant in discussing a purchase of gold.

9.    On October 26, 2015, Dmitri sent to plaintiff an e-mail wherein he explained the fee that plaintiff would be charged if plaintiff invested in gold through defendant Lear's firm as follows:

> "Great chatting with you today. Based on our conversation and understanding. Rolling over a portion of your IRA above $50,000 would put you at the institutional level that would give you the best pricing at the minimum/maximum

2

of 2% as agreed. I'll call you in a couple of days to make sure you received the information we spoke about. Have a great day. Kind regards,"

10.    On October 27, 2015, Dmitri e-mailed the following message concerning the fees plaintiff would be charged for purchasing gold by her:

"Hi Teresa. The 1st year fee is $275 that will subtracted from the monies that are transferred for the 1st year. The subsequent years will be $175 which is a lil over $14 per month to hold and maintain your metals at Brinks depository in Salt Lake City, Utah. We have 2 IRA promotions to cover your up-front fees for years. The 1st one is us sending you a $500 check for any transfers over $50,000 or the other promo is for $50,000 you get $1000 in free silver or gold depending on the asset you can choose. For every $25,000 in addition to that you get $250 in free silver or gold, that's it. If you have any more questions Teresa feel free to ask. Have a great day. Kind regards,"

11.    On November 2, 2015, Dmitri wrote:

"Hi Teresa, Hope you had a relaxing weekend. Just checking to see if you had any more questions about the IRA process. If not, after you fill out the apps. Just drop them off at a FEDEX location or box. Or if it's easier give me a call. I'll send FEDEX to your home or office and just hand him over the prepaid FEDEX envelope and we'll get the ball rolling. We're receiving daily articles about a dollar collapse as well as a stock collapse. Good time to diversify before we see a surge in metals and a crash in stocks. We'll chat soon. Kind regards,"

12.    Defendant Lear, by it agents, servants and employees, through television and radio advertisements in West Virginia, caused plaintiff to worry about having her money in stocks and also the collapse of the dollar as Dmitri also explained to her in the November 2, 2015, e-mail above.

13.    Defendant Lear also caused plaintiff to believe that there would be a surge in metals, including gold, in the near future and that by sending plaintiff's IRA account money to the defendant Lear, that they could protect her from the impending losses in value of her life-long savings by investing in gold.

14.    On December 10, 2015, at 5:01 p.m., defendant Lear, by and through Salvador, wrote to plaintiff and stated:

"Hello Teresa, I have made multiple attempts to contact you but no luck as of yet, a lot has happened from the last time we talked and I would like to share new developments that we see out in the markets. Please send me a note when is a good time to talk?"

15.     Defendant Lear, by its agents, servants and employees, pursued her and continued to make her believe that she was going to lose money in stocks or otherwise by the devaluation of the dollar.

16.     Throughout the time period leading up to October 2015, and thereafter, by various means and methods, including multiple calls to her home and to her person at work and other places in West Virginia, and by sending e-mails to her and by advertisements, defendant Lear by misrepresentation and trickery, made and caused plaintiff to believe defendant Lear's misrepresentation by both acts and overt statements which were not true in all respects and defendant Lear knew that they were seeking her out for the purpose of obtaining, converting and taking her money under false and fraudulent purposes.

17.     As Lear continued to pursue her, on December 10, 2015, plaintiff advised Mr. Salvador that her father had a stroke and then had additional strokes and that her only sister's husband had a lung transplant only to discover that he had been discovered to have lung, liver and spine cancer and that her sister-in-law was diagnosed with cancer.  Consequently, she advised Salvador that she had been under extreme emotional distress and that she had taken her sister-in-law into her home and was assisting her at her home with dealing with the trauma of chemotherapy.  She told him that she and her family had been overrun with the situation.

18.     Defendant Lear, by Mr. Salvador, on the same dayDecember 10, 2015, stated that he was sorry for that but he reminded her that:

a.      "We have seen a lot happen lately and things are still moving regardless if you have time or not;" and

4

    b.    "We have a turn-key system where we do all the heavy lifting for you when it comes to establishing your account."

    c.    "Let's please find a time that we can talk."

    d.    "I promise you one thing, it won't be a waste of your time."

    e.    "There is a lot at risk on your end the retirement account that can be effected very negatively overnight, IF WE DON'T DO ANYTHING ABOUT IT."

    f.    "Silver has always been a great way to preserve wealth."

    g.    "When is good time/day that we can touch base?"

    h.    "Let us help you."

19.    The above statements caused the plaintiff into believing that she must do something or lose all or a significant part of the money that she had worked for over her lifetime and saved in her IRA account for retirement for herself and her family.

20.    On December 10, 2015, at 6:16 p.m. defendant Lear, by Salvador, wrote to plaintiff and stated:

    a.    "I have attached two new articles that were just published."

    b.    "Take the time to read this."

    c.    "Facts are facts."

    d.    "Let's not be blindsided like many Americans were back in 2008 market crash."

21.    On January 20, 2016, at 6:16 p.m. Salvador, for defendant Lear, wrote to her and stated that Lear Capital was "the nation's most highly endorsed gold company." And that "we are committed to help you protect and grow your savings and retirement account."

22.    On January 20, 2016, defendant Lear forwarded to her additional articles, brochure and videos promoting gold and silver as the only safe manner in which to protect her retirement.

23.   On January 26, 2016, at 1:49 p.m. Salvador again wrote and stated that:

a.   "The silver markets continue to move up."

b.   "I wanted to find a time we can re-visit the possibility of protecting a portion of your portfolio."

24.   On January 26, 2016, at 11:31 p.m., Mrs. Evans wrote back and told Salvador that she "was pulling into chemo doctor," "just not a good time right now."

25.   On January 26, 2016, at 2:36 p.m., Salvador, disregarding that it was not a good time, wrote back to plaintiff and stated "what time would work best today."

26.   On February 2, 2016, Salvador, for defendant Lear, stated to plaintiff:

"Hello Teresa, Hope you're doing well. The markets are down again today another triple digits. I made an attempt to reach you earlier, let me know if you have time today."

And he advised her to read an article touting gold and silver.

27.   On or about March 21, 2016, defendant Lear advised plaintiff that they had a "dedicated IRA Department that could hold her money and continued to promise her that they could protect her retirement and that failure to purchase gold or silver would lead to disaster."

28.   On or about March 2016, plaintiff, in reliance upon the misrepresentation and continuing contacts with plaintiff and the misrepresentation by acts and omissions, caused plaintiff to believe she must invest in gold or silver or lose a significant portion of her money contacted defendant Lear and advised that she would invest as they had told her she must.

29.   Defendant Lear advised plaintiff that she had to set up a SEP account with the Horizon Bank in Houston, Texas and "Self Directed IRA Services, Inc.," a subsidiary of Horizon Bank, (hereinafter "SDIRA.")

30.   On or about March 23, 2016, plaintiff relied upon the representations that were made to her by defendant Lear and signed a form at the request of Greg Shenon, an agent,

6

servant and employee of defendant Lear with the position of "IRA Administrator." The form was for "employer and employee" IRA accounts and plaintiff advised Lear that the form did not appear to be applicable to her. The form was a form for defendant Self Directed IRA Services, Inc. and had its name on the form as being its own form prepared by it. Therefore, defendants were acting for and on behalf of each other in establishing an IRA account in Texas for a purpose as represented by Lear to protect her retirement money.

31.     On or about March 30, 2016, Lear contacted Scottrade which held plaintiff's IRA account and advised them that they were to wire $300,000 in plaintiff's IRA account to SDIRA.

32.     On March 31, 2016, Salvador wrote to plaintiff and stated at different times that day:

a.     "I made an attempt to reach out to you this morning when would be a good time."

b.     "Timing is sensitive because of price movement. This will only take at the most a few minutes of your time."

33.     On or about March 30, 2016, Lear called Teresa Evans and advised her of the storage fees which were $275 for first year for holding the gold and silver. At this time, the only fees Teresa had been told she was to pay was that storage fee and a 2% commission and fee as set forth in paragraph 10 above.

34.     On or before March 23, 2016, and prior to her permission to wire the monies, Teresa Evans, relying upon the representations of Lear and its agents, servants and employees was led to believe and believed that Lear was offering her a proposition and agreement that for the fees she had been advised of as set forth above or for fees which would certainly not exceed that amount, Lear would purchase gold and/or silver for and on her behalf and assure that her IRA and monies and gold and silver, which was purchased, would be protected and safe and that

7

their assurances and statements assured her that she would make money from Lear's purchases and management of her money.

35.     After coming to an understanding of the terms and conditions of the agreement between plaintiff and Lear and after Lear advising her to transfer her money into an IRA account in Waco, Texas, plaintiff agreed only with the terms and conditions that were discussed above. She then consented that Scottrade was permitted to wire $300,000 from her account o SDIRA.

36.     After she wired the money to what was represented to her as being an individual IRA account for her, she believed the money remained hers and under her possession and control like the one she had in Scottrade and she trusted SDIRA to protect and hold her money for safe keeping and would not transfer any of her money without her specific direction.

37.     After Scottrade transferred the $300,000 to SDIRA, and then SDIRA transferred the $300,000 to Lear without direction from plaintiff and SDIRA failed and refused to provide plaintiff with any documents or accounting from March 30, 2016, until October 10, 2016.

38.     On April 11, 2016, Lear, by Salvador, advised plaintiff that "your metals have been shipped out as of today, the latest update on silver as of today is that silver is now up 18% from beginning of the year.  Your timing could not have been better.  You are right on track to see the same advantages most investors saw when they invested during the last market correction and we all witnessed silver going up 600%.  I will be tracking your investment along with Dmitri Koonce.  We both will be on top of the markets and advising you how and when to sell in the coming years."

39.     Plaintiff relied upon the above advice and believed that her $300,000 was increasing in value at a reasonable, if not good, rate based upon Lear defendant's employees or

agent. She was at that point comforted and felt that they had and were protecting her money and would do so in the future.

40.    On April 21, 2016, plaintiff received a letter from Lear advising her that "Our account executives have consistently ranked in the upper 98[th] percentile of customer service surveys, but our goal in 2016 is to further our best in class service mark."

41.    On April 28, 2016, Teresa Evens received a letter that stated "With the volatility of today's economy, Precious Metals are a great investment area to compliment your overall portfolio.  Gold and Silver are great hedges against inflation and can protect your investment portfolio in this uncertain market" and Lear asked plaintiff to refer friends, family and co-workers and they would reward her.  At this point, plaintiff was never told what her account value was in any other way.  She believed her investment was solid and she was making money and the articles Lear sent further encouraged plaintiff.  They stated the "gains are just getting started" and similar language.

42.    After having not received an accounting statement from Lear or SDIRA by August and having been accustomed to Scottrade's prompt and regular reporting of her IRA, plaintiff requested Greg Shenon, a Lear employee, to provide her an accounting of her account and its value.  However, Ms. Shenon and Lear failed and refused to provide her with an accounting and on October 9, 2016, plaintiff again asked for an accounting of her IRA account activity.

43.    On October 10, 2016, plaintiff received an e-mail with instructions as to how she could log onto her account and found that it had dropped in value by approximately $100,000 and was only valued at about $200,000 without explanation as to why she had lost $100,000,

one-third of the amount she invested in a seven month period.  On October 29, 2016, at 1:13 p.m., she wrote to Salvador:

"Can you take a look at my account?  I'm having trouble understanding how gold and silver are rising and my account is down $100,000.  Am I reading something wrong?"

44.   On October 31, 2016, at 11:39 a.m., 2 days later, Salvador, for Lear, wrote back:

"Good Moring Teresa, I hope all is well and to answer your question. Yes you are reading it wrong. When can we get together and talk over the phone ? I tried contacting you several times during the month but no luck."

45.   On October 31, 2016 at 10:16 a.m., plaintiff, overjoyed that she had not lost $100,000 wrote "Oh yay!  Could we talk at 3:30 p.m. eastern time?  Salvador suggested the next day.  Plaintiff agreed but requested once again that Lear provider with "my documents and current value of account."

46.   On October 4, 2016, plaintiff finally had a conversation with Salvador.  In that conversation, plaintiff told Salvador that she finally logged into her account and found that her account was down $110,000 and that she wanted to know why that was so when silver and gold had risen in value since she had bought them.  Lear had advised her after she had purchased the gold that her value was increasing based upon the e-mails and articles that Lear had sent to her.  Salvador replied as follows:

a.    When a client receives their account statement it does not reflect the real value of her account because the value in her statement was wrong.

b.    Then, he stated to the effect that "when you purchase a home the fees are up front."  When you sell your home you take all of the profit.  We take our fees up front and when she sold would she would receive all the profit because Lear doesn't take anything on the back end.

c.    Salvador stated that he had gone over everything with her when they had obtained the money from her in the first place.

d.    Salvador admitted that when he went over the shipping order with her "it was quick, quick, quick, quick…" and they did everything quickly and aht he,

10

Salvador, was fearful that when Lear had done as quickly as they had done it with plaintiff, that she was going to be confused about what happened to her money.

e.   Salvador stated that everything was done quickly, but had falsely claimed that plaintiff filled out the document.

f.   He then stated that Lear's fee was 20-25% of the $300,000 which is $60,000 to $75,000.

g.   He then told her she would have to talk to their legal department when she stated that she wanted her money back and that the legal department would be in touch with her.

47.   During the conversation with Salvador, plaintiff requested that Lear send to her any document which explained the right Lear had to take $100,000 out of her account and any document even disclosing that they had taken $300,000 from her account.

48.   Salvador stated that language in a shipping and transaction document that he had admitted was done quickly had information concerning the right to a fee as they had deducted the same from her account.

49.   The agreement that plaintiff entered into with Lear was complete on or before the date that she signed the form to transfer the money to Lear and she forwarded the $300,000 to Lear on March 30, 2016.  The fees disclosed to here were as stated by Lear in e-mails to her and by Lear's employees.  No other fees were ever discussed.  There was never a discussion or disclosure ever of any fee before or after that date that the fee was to be 20%, 25% or 1/3 for Lear to convert to themselves upon receiving the money from her IRA account.

50.   On March 31, 2016, at 12:09 p.m. Dmitri Koonce called plaintiff on the phone and told her she needed to get to a computer to sign a shipping document so that her purchase of gold and silver could be taken care of by them.  Plaintiff was working at the time and her family issues as above were still a part of her everyday life.

11

51.   Dmitri then, at 12:13 p.m. send her an e-mail signature documents in Docusphere program format.

52.   Dmitri stayed on the phone with plaintiff and he told plaintiff that they have already filled everything out and all she needs to do is sign and initial certain places. He then directed plaintiff to the signature block in DocuSphere format and told her where to sign the shipping document. He did not tell her that she should read it, that there was anything in it between Lear and her other than the shipping of the gold so that they could purchase the gold. Plaintiff complied and signed it as directed.

53.   The entire time period from the time plaintiff received the e-mail with document and returned it to Dmitri was 3 minutes from 12:13 to 12:16 on December 31, 2016. During that time, Dmitri continued to tell her how good of an investment she was making and encouraging her to sign the DocuSphere signature blocks.

54.   Dmitri did not give plaintiff time to read the document, he did not suggest to her that she should read it before signing and plaintiff did not read the document before signing it based on Salvador's statement that it was a shipping document which would enable Lear to ship the gold to the IRA holding place since it could not be sent to her since it was in a IRA.

55.   Salvador then placed plaintiff on hold for several minutes as he explained the purchase was taking place and then Salvador came back on the line and told her he had to go over a few things and then everything will be over.

56.   Lear claimed that plaintiff had agreed to a fee in that conversation, however, the question and answer Lear refers to was intentionally wrongfully stated in a way to mislead a reasonable prudent person who had no knowledge of the Precious Medals' industry and was

12

depending upon Lear and its employees to help her understand what she was doing so she would not make a mistake.

57.    She advised Lear that she had not even purchased stock for years because she was afraid she would lose her money and Lear agreed to help her for that very reason.

58.    Lear claims that telling plaintiff that "you understand that our maximum ask-to-cost fee is 33 percent" was sufficient to advise her that they had a right to take one-third of her principal IRA account as soon as it was in the IRA account.  Plaintiff did not believe or understand that ask-to-cost fee had anything to do with her obligation to Lear.

59.    Lear's legal counsel, Jeremy Jason and customer service representatives in November 2016, claimed that they would not help her, that their agreement was iron-clad and can't be breached and can't be broken and that you signed it and said yes in the recorded conversation and you are bound to it and the 1/3 fee is what you owed.  That was the first time plaintiff had been told that by a representative of Lear.  Before, Mr. Salvador said it was 20-25% in the conversation with him after plaintiff first learned of the $100,000 deduction and 2% Prior to their agreement when she had Scottrade wire them the money.

## COUNT I

Plaintiff re-alleges the above allegations the same as if set forth herein and further alleges as follows:

60.    That on March 31, 2016, at 12:09 p.m., Lear representative Dmitri Koonce called Plaintiff Teresa Evans to inquire whether at that time she had access to a computer to receive a shipping document by email that she would need to immediately electronically initial and sign and transmit back by email in order to authorize the shipment of the gold and silver that was being purchased on her behalf by Lear pursuant to their prior agreement.  Said prior agreement

13

which, as previously alleged, included a term that Lear could charge a 2% fee on any investment exceeding $50,000.00 in value.

61.     That on March 31, 2016, at 12:13 p.m., the Plaintiff Teresa Evans received the electronic-signature document via email.  Further, that Dmitri Koonce had remained on the telephone and upon him transmitting the email and the plaintiff receiving the email and opening the electronic document, he then directed her to the boxes that required her electronic initials and signature.  While asking her several questions when doing so, at no time did Mr. Koonce inform the plaintiff that her initialing and signing the shipping document and answering his questions would be creating a new contract or agreement that would contain any terms altering or supplanting any material terms of her prior agreement with Lear, including the material term that Lear could only charge a 2% fee on any investment exceeding the value of $50,000.00.

62.     That the electronic-signature shipping document was emailed back to Mr. Koonce at 12:16 p.m. on March 31, 2016, with the entire time spent discussing the locations which required the Plaintiff's initials and signature and answering his questions taking significantly less than 3 minutes.

63.     That to the extent that Defendant Lear contends that such shipping document constituted a new valid and enforceable contract between the parties which altered or supplanted the terms of the parties' prior contractual agreement, and which enabled Lear to charge a fee greater than 2% on investments exceeding $50,000.00 and which requires the parties to submit any disputes to arbitration, it is incorrect and Lear is guilty of fraud in the execution or inception of such contract.  That in such event, plaintiff Teresa Evans was deceived as to the nature of her act involving the shipping document and did not know or understand what she was signing and did not intend to enter into any such contract at all.  Accordingly, mutual assent to such a

14

contract was lacking and such alleged contract is void.

64.     That, alternatively, in the event it is determined that such shipping document constitutes a valid and enforceable contract, the plaintiff was fraudulently induced as to an arbitration provision which appears in the contract.  More specifically, at no time during the above described conversation did Mr. Koonce inform or advise the plaintiff that said document contained any arbitration provision and/or otherwise inform the plaintiff that any dispute which arose under such document would be required to be submitted to arbitration, let alone the terms or conditions of any such arbitration. As previously alleged, Mr. Koonce directed the plaintiff where to place her electronic initials and signature and did not advise her to read the entire document or otherwise even provide her with sufficient time to do so within the above described time period.  Further, that even when an individual bears no duty to disclose material terms of a document or transaction to another, when they do act so as to disclose some of the terms or conditions they assume a duty to disclose all material terms and conditions.   Accordingly, Lear is guilty of fraudulent inducement in regard to the arbitration provision of said alleged contract and such arbitration provision is invalid, void, or voidable.

65.     Lear in this case set about to intentionally, knowingly and fraudulently establish a scheme and design which they determined would be an iron clad way to defraud citizens in West Virginia by advertising on the radio and on television about (a) gold, silver and precious metals and that West Virginia citizens should invest in same by using scare tactics to drive persons like plaintiff to contact them for information concerning investments in precious metals.

66.     Lear, once contacted, devised a scheme and design by utilizing their staff to trick citizens like plaintiff to decide to invest with Lear and to use SDIRA as their IRA account which is controlled by Lear for the sole purpose to take plaintiff's money by converting the plaintiff's

money unto itself as its own without plaintiff's knowledge.

67.    Lear intentionally and knowingly made statements to plaintiff as set forth above that induced her to have her IRA manager wire $300,000 of her savings to defendants under the false pretense that she would make money on her investment and without telling her that they were going to take $100,000 to themselves without advising her of same.

68.    Plaintiff relied upon Lear's representations and wired the money and as a result, she has been damaged in the following ways:

    a.    She has lost all or at least well over $100,000 at this time since she does not have any of her money back even though she has demanded the same be returned to her and defendants have refused;

    b.    She has lost the use and enjoyment of her money;

    c.    She has suffered severe emotional distress as a result of Lear's acts, conduct and omissions; and

    d.    Other damages including attorney fees and costs and expenses pertaining to her account.

Wherefore plaintiff demands judgment against defendants and each of them for compensatory and punitive damages and trial by jury, costs and disbursements of the action and for such other and further relief as the Court deems proper.

## COUNT II

1.   Plaintiff re-alleges the above allegations the same as if set forth herein and further alleges as follows:

2.   Defendants and each of them are telemarketers who conducted telemarketing solicitation and activities within the meaning of West Virginia Code § 46A-6F-112 and § 46A-6F-113.

3.   Defendants and their agents, servants and employees and joint venturers, failed to make the mandatory disclosures required of § 46A-6F-401 in that defendants failed to make material terms of the transaction clear and conspicuous.

4. In the conduct described herein in plaintiff's complaint, the defendants engaged in unfair and deceptive practices in violations of § 46A-6F-501 by failing to obtain proper informed authorization and consent and engaging in conduct as set forth herein that created a likelihood of confusion and misunderstanding to a reasonable consumer and by providing substantial assistance or support to a telemarketer when each defendant knew or should have known that the telemarketer was engaged in acts that constituted violations of § 46A-6F-101 et seq.

5. As a result of the wrongful conduct as aforesaid, plaintiff seeks and is entitled to compensatory damages, punitive damages, penalties, attorney fees, costs and interest and other remedies as prescribed by § 46A-6F-101 et seq., including but not limited to §46A-6F-502, or otherwise as provided by law.

Wherefore plaintiff demands judgment against defendants and each of them for compensatory and punitive damages and trial by jury, costs and disbursements of the action and for such other and further relief as the Court deems proper.

17

TERESA EVANS,

By Counsel

Marvin W. Masters
West Virginia State Bar No. 2359
The Masters Law Firm lc
181 Summers Street
Charleston, West Virginia  25301-2177
(304) 342-3106
Counsel for Plaintiff
F:\mary\Evans, Teresa\p001.docx

18

IN THE CIRCUIT COURT OF JACKSON COUNTY, WEST VIRGINIA

TERESA EVANS,

          Plaintiff,

v.                                 Civil Action No. 17-C-31
                                 Honorable Judge Lora Dyer

LEAR CAPITAL, INC., a corporation and
Its Affiliates; SELF DIRECTED IRA
SERVICES, INC.

          Defendants.

TO: A. Lee Rigby
      *Counsel for Self Directed IRA Services, Inc.*

## ACKNOWLEDGMENT AND ACCEPTANCE OF SERVICE OF SUMMONS

    I hereby acknowledge receipt of the Summons and First Amended Complaint in the above-captioned matter. I certify I am authorized to accept service thereof on behalf of **Self Directed IRA Services, Inc.**, as their legal counsel and attorney at law. I expressly reserve the right to assert all defenses and objections available under the West Virginia Rules of Civil Procedure, except for any objection with respect to the sufficient service hereof. Answer or other response to the First Amended Complaint herein is due on or before ~~June 15, 2017~~.

                                                      JUNE 22, 2017

A. Lee Rigby, Esquire
*Counsel for Self Directed IRA Services, Inc.*

F:\5\1017\ua0006.docx

IN THE CIRCUIT COURT OF JACKSON COUNTY, WEST VIRGINIA

TERESA EVANS,

        Plaintiff,

v.

                                      Civil Action No. 17-C-31
                                      Honorable Judge Lora Dyer

LEAR CAPITAL, INC., a corporation and
Its Affiliates; SELF DIRECTED IRA
SERVICES, INC.

        Defendants.

## CERTIFICATE OF SERVICE

I, Marvin W. Masters, counsel for plaintiff, do hereby certify that a true and exact

copy of the foregoing "Acknowledgement and Acceptance of Service of Summons" was

served upon:

> A. Lee Rigby
> Smith Robertson Elliott LLP
> 221 West Sixth Street, Suite 1100
> Austin, Texas 78701
> Counsel for Defendant Self Directed IRA Services, Inc.

in an envelope properly addressed, stamped and deposited in the regular course of the

United States Mail, this 24th day of May, 2017.

                                        Marvin W. Masters
                                        West Virginia State Bar No. 2359

F:\5\1017\x.docx